Motion to dismiss the appeals denied as academic.

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v REGINALD WIGGINS, Appellant. [39 NYS3d 395]—

Judgment, Supreme Court, New York County (Ronald A. Zweibel, J.), rendered October 7, 2014, convicting defendant, upon his plea of guilty, of manslaughter in the first degree, and sentencing him to a term of 12 years, modified, on the law, to the extent of reducing the amounts of the mandatory surcharge and the crime victim assistance fees from $300 to $250 and $25 to $20, respectively, and otherwise affirmed.

Because of the unusual facts of this case, a detailed chronology is necessary to put our analysis into proper context.

On May 24, 2008, at approximately 1:00 a.m., defendant and

codefendant Jamal Armstead were outside 133 West 90th Street in Manhattan where a sweet 16 party was ending. They were approached by a female partygoer who told them that a person named Trimel Branford had insulted her at the party. Defendant and Armstead then proceeded to confront Branford. Intending to "avenge" the slight to her, Armstead pointed a gun at Branford and pulled the trigger twice, but the gun misfired. Armstead handed the gun to defendant who, after hitting it with his hand, pointed it at Branford and fired. The shot missed Branford but struck a 15-year-old bystander, who died from his wounds later that morning.

On May 28, 2008, the police arrested both Armstead and defendant. Armstead made statements to the police that implicated defendant in the shooting.

On July 2, 2008, both defendant and Armstead were charged, in a single indictment, with murder in the second degree, attempted murder in the second degree (two counts) and criminal possession of a weapon in the second degree. They were arraigned on these charges on July 7, 2008.

Defendant filed an omnibus motion on August 26, 2008, seeking, among other relief, severance of his case from Armstead's on the ground that they had antagonistic defenses and that Armstead's statements ran afoul of defendant's right to confrontation under *Bruton v United States* (391 US 123 [1968]). The People responded to the motion on October 15 and, on October 23, 2008, the motion court denied defendant's request to sever on antagonistic defense grounds, finding that defendant had not made any allegations demonstrating an antagonistic defense. The motion to sever on *Bruton* grounds was held in abeyance until resolution of Armstead's motion to suppress his statements. The court adjourned the case for discovery until March 2, 2009, because defendant was awaiting receipt of the medical examiner's report.

From March 2, 2009 to August 28, 2012, the date the court ruled on the admissibility of Armstead's statements, the court adjourned the case numerous times either at the request of, or on consent of, defendant or Armstead. Additionally, between January 9, 2009 and June 30, 2011, Armstead consented to numerous adjournments requested by the People as the prosecutor attempted to negotiate a cooperation agreement with his counsel, meeting with Armstead and his counsel on several occasions.[1]

---

**1.** Although the dissent complains that our chronology failed to make explicit that defendant's severance motion was not decided until over four

On June 24, 2011, Armstead moved pro se for assignment of new counsel, which application was granted on July 14, 2011.

Armstead's case was adjourned from March 2, 2010 to March 16, 2010 due to a fire in the courthouse. On September 21, 2010, the assigned ADA went on maternity leave, resulting in an adjournment to November 18, 2010. From July 14, 2011 until May 29, 2012, every adjournment was requested by Armstead's counsel, either to prepare for trial or for personal reasons.

On July 21, 2011, the People announced their readiness for trial with respect to Armstead. It was the People's intention to try Armstead first, on the theory that a conviction would give Armstead the incentive to testify against defendant. Armstead's counsel was not ready for trial until May 29, 2012.

During this period, and while the current action was pending, defendant was involved in two assaults resulting in two additional indictments. The first, charging defendant with conspiracy and gang assault, was handed down on April 1, 2009 and was pending until March 8, 2013, when the indictment was dismissed. The second incident occurred on October 5, 2011 at the Manhattan Detention Center, where defendant and two other men assaulted another inmate. This indictment charged defendant with attempted gang assault in the first degree, attempted assault in the first degree and assault in the second degree. Defendant was convicted after trial of assault in the second degree and on June 10, 2013, was sentenced to a prison term of $4\frac{1}{2}$ years.

Between May 29 and June 12, 2012, a *Huntley* hearing was held with respect to the statements made by Armstead to the police. Armstead's motion to suppress those statements was denied on August 28, 2012. At the conclusion of the hearing, Armstead's counsel advised the court that he needed emergency cataract surgery and requested an adjournment. The People opposed further adjournments, noting the effect further adjournments might have on defendant's case. Defendant joined in the People's objection but the court granted Armstead's request for an adjournment.

On October 9, 2012, Armstead's first trial began and a partial verdict convicting him of criminal possession of a weapon in the second degree was rendered on October 25, 2012. Due to Hurricane Sandy, the court could not reconvene until November

years after it was made, and that the requests for adjournments between January 9, 2009 and June 30, 2011 were made by the People, these facts are clearly denoted herein.

7, 2012. Only 11 jurors returned and the court declared a mistrial on the remaining counts. The People informed the court that they intended to retry Armstead before trying defendant. Armstead's counsel requested and received an adjournment to April 2013. On January 14, 2013, defendant, at his request, was assigned new counsel and his case was adjourned to February 14, 2013, so that new counsel could familiarize himself with the case.

On April 22, 2013, Armstead's second trial began. On the same day, defendant's unrelated gang assault trial also commenced. On May 15, 2013, Armstead's second trial ended in a mistrial. The People immediately announced their readiness and requested a second retrial. However, Armstead's counsel was not available to proceed until January 2014.

On May 7, 2013, defendant moved, for the first time, to dismiss the indictment on constitutional speedy trial grounds, which motion was denied on December 5, 2013.

On January 8, 2014, Armstead's third trial began. It ended on January 31, 2013 when the jury acquitted him of murder in the second degree but could not reach a verdict on the two attempted murder counts, resulting in yet another mistrial as to those counts. On April 10, 2014, Armstead's fourth trial was scheduled to begin on August 21, 2014. On June 11, 2014, defendant filed a second constitutional speedy trial motion, which he subsequently withdrew as part of his plea bargain.

Defendant pleaded guilty to manslaughter in the first degree on September 23, 2014 in full satisfaction of the indictment. He was promised a sentence of 12 years to run nunc pro tunc from the date of his arrest and concurrent with the 4½ year sentence he was currently serving on the conviction for assault in the second degree. The agreed upon sentence was imposed on October 7, 2014.

The lodestar guiding our analysis of the speedy trial issue raised in this case is, of course, *People v Taranovich* (37 NY2d 442 [1975]). The Court held that "there is no specific temporal duration" that would mandate a dismissal on speedy trial grounds (*id.* at 444-445). Rather, a court must "examine the claim in light of the particular factors" present in the case before it, with the realization that "there are no clear cut answers in such an inquiry" (*id.* at 444-445). The analysis involves "a sensitive weighing process of the diversified factors present in the particular case" (*id.*). These factors "must be evaluated on an *ad hoc* basis" as they apply to the facts of each case (*id.*). Finally, the Court stressed that "no one factor or combination of the factors . . . is necessarily decisive or

determinative of the speedy trial claim, but rather the particular case must be considered in light of all the factors as they apply to it" (id.).

The Court went on to list five factors that must be considered in any analysis of a speedy trial claim: "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay" (id.).

There is no question that the six-year delay between the shooting in 2008 and defendant's guilty plea in 2014 was "extraordinary" (People v Staley, 41 NY2d 789, 792 [1977]). The burden is on the People to show good cause for the delay (People v Singer, 44 NY2d 241, 254 [1978]). This factor weighs in favor of defendant and leads to a consideration of the second Taranovich factor, i.e., the reason for the delay.

The chronology of this case highlights some of the problems faced by the courts of this state in large metropolitan areas. These include overburdened courts, overcrowded jails, and overworked prosecutors and legal services defense counsel. Nevertheless, these issues must be considered in the context of this particular case as they affect, if at all, this particular defendant.

The dissent tends to minimize the defense side of the equation in determining the reason for the delay, choosing to focus on the prosecution's attempt to get Armstead to testify against defendant as the main reason for the delay in bringing him to trial. While the attempt to get Armstead to testify against defendant certainly played an important role in the delay, it is not the only reason and ignores the many other causes for the delay.

The above chronology shows that much of the delay was occasioned by requests for adjournments by defendant and/or his codefendant for motion practice, change of counsel, discovery proceedings, unavailability of co-defendant's counsel and the like. In the analogous CPL 30.30 situation, adjournments granted with a codefendant's consent are not chargeable to the People (see e.g. People v Kronberg, 277 AD2d 182, 183 [1st Dept 2000], lv denied 96 NY2d 785 [2001]; People v Delvalle, 265 AD2d 174 [1st Dept 1999], lv denied 94 NY2d 879 [2000]), and they should not be chargeable here. Despite the dissent's conclusion to the contrary, the record supports the conclusion that these adjournments were not motivated by a goal on the part of the People to gain an unfair tactical advantage over de-

fendant (*see People v Brown*, 138 AD3d 491 [1st Dept 2016], *lv denied* 27 NY3d 1129 [2016]).

Indeed, Armstead either requested or consented to several adjournments between January 9, 2009 and June 30, 2011. He also actively participated with counsel in meetings and discussions concerning the possibility of testifying against defendant. The dissent posits that the People should have abandoned such efforts after Armstead repeatedly refused to testify, and that the continuation of these efforts are evidence of their overall bad faith in delaying bringing defendant to trial. To support this conclusion, the dissent contends that the People do not claim that Armstead's testimony was "essential to its case" and thus, by their continued attempts to obtain his cooperation, they demonstrated a lack of good faith. However, no precedent is cited for the proposition that, in order to demonstrate good faith, the testimony of a codefendant needs to be "essential" to the prosecution's case. Nor can such a rule be inferred from *People v Kelly* (38 NY2d 633 [1976]), as cited by the dissent. While the Court of Appeals categorized the testimony of an incapacitated witness in that case as "essential" to the People's case in an essentially one witness case (*id.* at 636), it did not make that term a requirement to demonstrate good faith efforts on the part of the People in attempting to obtain witness testimony. In point of fact, the Court was following its own precedent set out in *Taranovich* that, in analyzing a speedy trial claim, "no one factor or combination of the factors" set out there is determinative of the speedy trial issue, "but rather the particular case must be considered in light of all the factors as they apply to it" (*Taranovich*, 37 NY2d at 445). Indeed, to adopt such a rigid rule, as suggested by the dissent, would negate the individual case analysis mandated by *Taranovich*.

Whether "essential" or not, it is clear from the result of the several trials of Armstead that his testimony would, as the People contend, "significantly enhance the overall nature and quality of the evidence against . . . defendant." The point is made by the fact that Armstead was acquitted on the murder count and that three separate juries were not able to reach a verdict on the two attempted murder counts in the indictment. Although the dissent contends this case, while serious, is not complex in light of the fact that the shooting took place in front of many witnesses who were available to the People, those same witnesses surely testified in Armstead's trials and were obviously not particularly convincing. Armstead's statements to the police implicating defendant in the shooting thus take on a heightened significance and justify the People's repeated attempts to obtain his testimony against defendant.

In any event, it is not for the courts to second guess "the significant amount of discretion that the People must of necessity have" in the prosecution of an indictment (*People v Decker*, 13 NY3d 12, 15 [2009]), so long as they act in good faith. Indeed, "a determination made in good faith to delay prosecution for sufficient reasons will not deprive [a] defendant of due process even though there may be some prejudice to defendant" (*id*. at 14, quoting *People v Vernace*, 96 NY2d 886, 888 [2001]). There is nothing in this record to support the contention that the People acted in anything other than in good faith in seeking to obtain Armstead's testimony.

While it is true that the People changed the ADAs handling the case several times, these changes were made for valid reasons, such as maternity leave, and were not designed to delay the trial of either defendant, or to gain a tactical advantage thereby (*People v Brown*, 138 AD3d at 491).

Additionally, there were several incidents occasioning delay beyond the control of either party, such as a fire in the courthouse and Hurricane Sandy. On the whole, therefore, this factor favors the People.

It is uncontested that the third *Taranovich* factor—the nature of the underlying charge—clearly weighs in favor of the People. The defendant was charged, inter alia, with the murder of a 15-year-old bystander. It is expected that the People would "proceed with far more caution and deliberation" in such a case as opposed to a relatively minor offense (*People v Taranovich*, 37 NY2d at 446). Defendant contends however, that this does not justify the lengthy delay in this case. This overlooks the fact that the People should not be faulted for trying to develop the strongest case possible against this defendant, the individual who actually fired the fatal shot. This is particularly true in light of the results of Armstead's jury trials, as noted above.

With respect to the fourth factor, there has been a significant period of pretrial incarceration, a factor that favors defendant. However, as noted above, during a significant portion of this time, defendant was also under indictment for two other assault charges, one of which resulted in a conviction and sentence of 4½ years. We have consistently held that the time during which a defendant is incarcerated on other charges is not charged to the People (*see People v Jackson*, 178 AD2d 305, 305-306 [1st Dept 1991], *lv denied* 79 NY2d 948 [1992]; *People v Davis*, 197 AD2d 375, 376 [1st Dept 1993], *lv denied* 82 NY2d 893 [1993]; *People v Neal*, 208 AD2d 400, 400 [1st Dept 1994], *lv denied* 84 NY2d 1014 [1994]; *People v Allen*, 203 AD2d 97,

97-98 [1st Dept 1994], *lv denied* 83 NY2d 963 [1994]). The claim by defendant, adopted by the dissent, that perhaps defendant would not have been involved in these incidents had he not been incarcerated awaiting trial in the instant case is nothing more than sheer speculation and wishful thinking, particularly in light of the fact that he fired a weapon directly at an individual to avenge a perceived slight to another person.

Finally, as to the fifth *Taranovich* factor, defendant has not shown any prejudice as a result of the delay to warrant a dismissal of this indictment. While the dissent disagrees with this conclusion, it should be noted that there is no claim that his incarceration made it difficult for him to participate in his defense, or confer with his counsel. General allegations that witnesses were "likely" to forget information or become unavailable is not sufficient to demonstrate the prejudice necessary to have this factor favor the defendant (*People v Romeo*, 12 NY3d 51, 58 [2009], *cert denied* 558 US 817 [2009]). Certainly "some degree of prejudice will result" from lengthy pretrial incarceration; however, general allegations of prejudice do not establish that the defense was "significantly impaired by the delay" (*People v Decker*, 13 NY3d at 15-16).

The dissent distorts our writing by stating we "downplay[ ] society's interest in prompt prosecution" because this interest is not addressed in *Taranovich*. Nothing herein even suggests such a conclusion. Unjustified delays in prosecuting those accused of a crime inure to no one's benefit: not prosecutors, nor defendants, nor society as a whole. We take no issue with the fact that actual prejudice need not be shown except in preindictment delay cases (*see People v Staley*, 41 NY2d at 792). The point here, as the dissent correctly notes, is that general claims of "presumptive prejudice cannot alone carry a Sixth Amendment claim[,] . . . it is part of the mix of relevant facts, and its importance increases with the length of delay" (*Doggett v United States*, 505 US 647, 655-656 [1992]). This, of course, is wholly consistent with *Taranovich*'s mandate that all factors must be considered and applied to each individual case to determine if a defendant's right to prompt prosecution has been violated.

The dissent conflates two separate and distinct penal concepts in taking exception to our conclusion regarding the fifth factor. The prejudice required to meet the *Taranovich* factor is not the same as what can only be characterized as a claim of a lost opportunity for rehabilitation. *Taranovich* speaks to incarceration affecting a defendant's ability to defend against the charges brought against him or her and the impact such

prejudice has on his or her chances for an acquittal. It does not address rehabilitation issues. Although the dissent uses generic studies and the like[2] to support the claim of bad faith on the part of the People, these have no application to this defendant in this case since, as we noted at length above, there is nothing in this record to even remotely support the dissent's contention that the decision to try Armstead first and then continue to try him before this defendant, was based on anything other than prosecutorial discretion made in good faith. Thus, this factor favors the People.

We conclude, therefore, that the motion court properly denied defendant's constitutional speedy trial claim.

Defendant made a valid waiver of his right to appeal (*see People v Sanders*, 25 NY3d 337, 341 [2015]; *People v Lopez*, 6 NY3d 248, 256-257 [2006]), which forecloses review of his excessive sentence claim. Regardless of whether defendant validly waived his right to appeal, we perceive no basis for reducing the sentence.

As the People concede, since defendant committed the crime before the effective dates of legislation increasing the mandatory surcharge and crime victim assistance fees, he is entitled to the modification indicated. Concur—Tom, J.P., Sweeny and Richter, JJ.

Moskowitz and Gesmer, JJ., dissent in a memorandum by Gesmer, J., as follows: I respectfully dissent.

The Sixth Amendment to the United States Constitution and the New York State Bill of Rights (Civil Rights Law § 12) guarantee the right to a speedy trial to an individual charged with a crime. Under the New York State Constitution's due process clause, the individual charged with a crime is guaranteed an even broader right to be prosecuted without unreasonable delay (NY Const, art I, § 6; *People v Singer*, 44 NY2d 241, 253 [1978]; *People v Staley*, 41 NY2d 789 [1977]; *People v Winfrey*, 20 NY2d 138, 143 [1967]; *People v Wilson*, 8 NY2d 391, 394 [1960]). It is the obligation of the People to bring the defendant to trial promptly (*Barker v Wingo*, 407 US 514, 529 [1972]; *People v Prosser*, 309 NY 353, 358 [1955]). The right to a speedy trial reflects both the right of the accused to "be treated according to decent and fair procedures" and "a societal interest in providing a speedy trial[,] which exists separate

2. Besides having no relevance to the issue before us, the conditions at Rikers Island and any related news reports are not part of the record and, hence, cannot be considered. Those concerns are more properly addressed in the public policy arena.

from, and at times in opposition to, the interests of the accused" (*Barker v Wingo*, 407 US at 519).

To determine whether a defendant's right to a speedy trial has been violated, the Court of Appeals directs us to examine five factors: "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay" (*People v Taranovich*, 37 NY2d 442, 445 [1975]). "Courts must engage in a sensitive weighing process of the diversified factors in the particular case" (*People v Vernace*, 96 NY2d 886, 887 [2001]).

Here, there is no dispute that the crimes with which defendant was charged, and the one to which he pleaded guilty, are serious.[1] There is also no dispute that his period of incarceration while awaiting a trial that never happened, which extended from his arrest at age 16 on May 28, 2008 until his entry of a plea on September 23, 2014, six years, three months and 25 days later, is extraordinary. Indeed, while "there is no specific temporal duration after which a defendant automatically becomes entitled to release for denial of a speedy trial" (*People v Taranovich*, 37 NY2d at 444-445), the trial court's decision on defendant's first speedy trial motion found that his incarceration for the 5½ years from May 27, 2008 to December 5, 2013 was "extraordinary," and the majority concedes, as it must, that the six-plus years defendant ultimately awaited trial was extraordinary (*see Barker v Wingo*, 407 US at 533 [five years "extraordinary"]; *People v Staley*, 41 NY2d at 792 [31 months "extraordinary"]; *People v Winfrey*, 20 NY2d at 143 [4½ years "unreasonable"]; *People v Moore*, 63 AD2d 602, 605 [1st Dept 1978, Sandler, J., dissenting], *revd on dissenting mem* 47 NY2d 872, 874 [1979] [18½ months "shocking"]). Accordingly, I will address the second, fourth and fifth *Taranovich* factors, the only factors at issue.

Where there has been "protracted delay, certainly over a period of years, the burden is on the prosecution to establish good cause" (*People v Singer*, 44 NY2d 241, 254 [1978]). In

---

1. On the other hand, the policy reason underlying this factor is the complexity of trying a serious case (*People v Johnson*, 38 NY2d 271, 277 [1975]), which was not a real factor here, where the case involved no complex legal theories and the police were already in contact with a substantial number of the many witnesses to the alleged crime (*cf. People v Brown*, 117 AD2d 978, 979 [4th Dept 1986] [although case involved five codefendants and numerous charges, it was not complex because the "required evidence and witnesses were available to the People at an early date"]; *People v Virgil*, 115 AD2d 286 [4th Dept 1985]).

order to assess whether the People have done so, it is critical to lay out the sequence of events in detail. The majority's recitation of the history omits or obscures some critical facts and asserts at least three alleged facts that are not supported by the record. As to the latter, I can find no support in the record for the following statements by the majority: (1) that the same witnesses to the shooting who would have testified at defendant's trial testified at the coefendant's trials, and that there is reason to believe that they would not have made convincing witnesses had they done so; (2) that defendant fired a weapon "directly" at an individual "to avenge a perceived slight" to another; the record does not show where, or even whether, defendant aimed the gun in his hand, and with what intent, if any; and (3) that defendant was "involved" in two prison assaults; no such inference can be drawn from the dismissed indictment for the alleged 2009 incident.

The majority does not make explicit the following very central facts: that the People began requesting adjournments to seek the codefendant's cooperation as early as January 9, 2009; that they continued to negotiate with the codefendant for his cooperation for over two years; and that defendant's severance motion was not decided until four years after it was made.

The critical points in the chronology include the following:

May 28, 2008: Defendant is arrested for a shooting which occurred on May 24, on a public street, in front of numerous witnesses.

July 7, 2008: Defendant is indicted, with a codefendant.

August 26, 2008: Defendant files an omnibus motion, including a motion for severance.

October 23, 2008: The court rules on defendant's omnibus motion, but holds in abeyance that portion of his severance motion based on his rights under *Bruton v United States* (391 US 123 [1968]), pending the codefendant's *Huntley* hearing seeking to suppress his statements, which implicated defendant.

January 9, 2009: The People request an adjournment to work toward a cooperation agreement with the codefendant.

January 2009 through June 30, 2011: Negotiations with the codefendant continue, delayed by repeated replacements of the assigned Assistant District Attorney.

June 2011: The codefendant rejects a cooperation agreement and fires his attorney; the case is adjourned to March 15, 2012, and then further adjourned.

October 5, 2011: After more than three years in Rikers, defendant is involved in a jailhouse fight, resulting in imposition of a 4½ year sentence on June 10, 2013.

August 28, 2012: Defendant's severance motion is granted, four years after it was filed.

October 2012: The codefendant's first trial begins, and ends in a mistrial on November 7, 2012.

April 22, 2013: The codefendant's second trial begins, and ends in a mistrial on May 15, 2013.

May 7, 2013: After more than 40 adjournments, defendant moves to dismiss the indictment, based on deprivation of his right to a speedy trial.

December 5, 2013: The court denies defendant's first speedy trial motion.

January 8, 2014: The codefendant's third trial begins and ends in a mistrial on January 31, 2014. The court schedules his fourth trial to begin on August 21, 2014.

June 11, 2014: Defendant files a second speedy trial motion, noting that his case had been adjourned more than 50 times.

September 23, 2014: The codefendant's fourth trial had not begun; the People had not yet filed any opposition to defendant's speedy trial motion. Defendant pleads guilty to manslaughter, and withdraws his second speedy trial motion.

The majority views the reasons for the delay, which encompassed all of defendant's adolescence from the age of 16 on, as being caused by a combination of neutral or benign factors, and holds that the People were not trying "to gain an unfair tactical advantage over defendant," which they acknowledge would have been improper (*see Barker v Wingo*, 407 US at 531 n 32, quoting *United States v Marion*, 404 US 307, 325 [1971]; *see also People v Brown*, 138 AD3d 491 [2016]). However, the majority overlooks that here, except for defendant's five adjournment requests,[2] the latest of which occurred on January 14, 2013, none of the other adjournments would have been necessary but for the People's insistence on delaying defendant's trial in order to seek his codefendant's cooperation. The People's continuation of this tactic for six years, even after the codefendant repeatedly refused to cooperate, and after the People had taken the codefendant to trial three times, each ending in a mistrial, was certainly a strategic decision, and ultimately created a tactical advantage for the People.

Moreover, by the time of the decision on defendant's first speedy trial motion, the People were certainly on notice that

---

**2.** According to the People's brief, defendant's counsel requested adjournments from March 2, 2009 to April 1, and then April 30, 2009; from December 3, 2009 to January 21, 2010; from November 18, 2010 to January 10, 2011; and from January 14, 2013 to February 14, 2013.

further delay could tip the scales in the direction of a constitutional violation. Instead of heeding this warning, the People attempted to try the codefendant twice more, creating nearly another year of delay. At the time defendant finally pleaded, his codefendant's fourth trial had been adjourned, and no end to the People's long unsuccessful tactic was in sight.

I disagree with the majority's view that the People have demonstrated that their decision to strengthen their case by obtaining the codefendant's cooperation and testimony against defendant was made in "good faith" (*People v Singer*, 44 NY2d at 254). While some time spent trying to gain the codefendant's cooperation might have been reasonable, the People concede that he refused their cooperation agreement and had "repeatedly indicated through his lawyer that he [would] *never* testify against the defendant" (emphasis added). Nonetheless, the People decided to try him first in an effort to induce his cooperation.

The People do not argue that the codefendant's testimony was essential to its case but merely that it "would significantly enhance the overall nature and quality of the evidence against the defendant." The majority adds that this "point is made by the fact that [the codefendant] was acquitted on the murder count and that three separate juries were not able to reach a verdict on the two attempted murder counts in the indictment." However, these facts could equally be understood to indicate that the prosecution's strategy of trying the codefendant first was unlikely to prove successful. Furthermore, it is difficult to see how the testimony of a codefendant, who would have much to gain from cooperating, could significantly enhance the People's case when the People had disinterested eyewitnesses available to testify, including the intended target of the shooting. The majority's claim that these witnesses "surely" testified at the codefendant's trial and were "obviously not particularly convincing" is speculative and not supported by the record.

The majority also states that no precedent exists for the proposition that the evidence sought by the People and cited by them as a good faith reason for the delay must be essential, rather than merely helpful. I agree with the majority that *Taranovich* calls for a careful weighing of the factors in each case, rather than rigid rules. However consideration of the degree to which such evidence is necessary must be part of our "sensitive weighing process" (*People v Vernace*, 96 NY2d at 887). For example, in *Barker v Wingo*, where a codefendant's testimony was concededly necessary to convict the defendant (407 US 514, 516), the Supreme Court still held that a period

of over four years during which the State repeatedly tried the codefendant first was "too long"[3] (*id.* at 534). Similarly, in *People v Kelly* (38 NY2d 633, 636 [1976]), the Court of Appeals held that the fact that the testimony of an unavailable prosecution witness was "essential" made the resulting delay "excusable."

Although CPL 30.30 does not apply in this case because of the nature of the charges, as discussed later in this decision, the majority appears to view it as instructive in determining this case. That statute recognizes as excusable only delays caused by the People's pursuit of crucial evidence. Specifically, it provides that periods of delay shall not be counted against the People when they are: (1) "occasioned by exceptional circumstances," or (2) where the People are unable, after due diligence, to obtain evidence that is "material to the [P]eople's case" and there are "reasonable grounds to believe that such evidence will become available in a reasonable period" (CPL 30.30 [4] [g]). The desire of the People to have one codefendant testify against another is not exceptional. In the face of the codefendant's statement that he would not testify against the defendant, the People had no reason to believe that his testimony would be "material," and, even if it had been, the People had no "reasonable grounds to believe that [the code-fendant's testimony would] become available in a reasonable period."

I also disagree with the majority's view that "much of the delay was occasioned by requests for adjournments by defendant and/or his codefendant." As discussed above, even the People admit that only five adjournments out of more than 50 are attributable to defendant, and all were before his first speedy trial motion. Both of the cases cited by the majority for the proposition that adjournments requested by, or granted with the consent of, the codefendant are not "chargeable to the People" were decided pursuant to CPL 30.30 (*People v Kronberg*, 277 AD2d 182, 183 [1st Dept 2000], *lv denied* 96 NY2d 785 [2001]; *People v Delvalle*, 265 AD2d 174 [1st Dept 1999], *lv denied* 94 NY2d 879 [2000]), which does not apply in this case. Even if this Court chooses to use that statute as guidance, it provides for "a reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial pursuant to this section has not run and good cause is not

---

**3.** The Supreme Court's determination in that case that there was no speedy trial violation has little relevance to this case since Mr. Barker was incarcerated during only 10 months of the long delay and did not want a speedy trial (407 US at 520, 536). In contrast, Mr. Wiggins was incarcerated during the entire period, and repeatedly raised the speedy trial issue.

shown for granting a severance" (CPL 30.30 [4] [d]). In *Delvalle*, this Court held that one month was a reasonable period of time for the People to conduct plea negotiations with codefendants. The *Kronberg* opinion does not discuss the length of delay attributable to the People's decision to try a codefendant first, and does not explicitly cite to CPL 30.30. However, it cites to *People v David* (253 AD2d 642, 644 [1st Dept 1998], *lv denied* 92 NY2d 948 [1998]), a CPL 30.30 case, which held that the People's delays totaling 22 days in connection with the codefendant's attorney's request to be relieved and a motion brought by the codefendant should not have been charged against the People. Here, defendant had shown good cause for granting severance, as we know, because his motion for that relief was granted four years after it was made, after the codefendant's suppression hearing. Four years is not a "reasonable" period of delay. Furthermore, in *People v David*, this Court also held that a 36-day delay in holding a suppression hearing was excessive and chargeable to the People under CPL 30.30 (253 AD2d at 644).

While I share the majority's concern about the multitude of problems our courts face, such as very large dockets, overcrowded jails, and overworked prosecutors and legal services defense counsel, I do not agree that these issues account for the extraordinary delay in this case. Even if they did, the U.S. Supreme Court has stated that "[a] more neutral reason [for delay] such as negligence or overcrowded courts should be weighted less heavily [against the prosecutor] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant" (*Barker v Wingo*, 407 US at 531; *see also People v Johnson*, 38 NY2d at 279; *People v Blakley*, 34 NY2d 311, 317 [1974]).

One adjournment was attributable to a fire in the courthouse in or about March 2010. Some of the delay resulted from personnel issues in the prosecutor's office, which has been held inadequate to justify a lengthy delay (*People v Moore*, 63 AD2d at 604-605 [Sandler, J., dissenting], *revd on dissenting mem* 47 NY2d 872 [1979]). However, the vast majority of adjournments were due to the People's repeated and unsuccessful attempts over four years to gain the codefendant's cooperation, and then, when that proved unsuccessful, the People's repeated and unsuccessful attempts over an additional two years to try the codefendant before defendant, in the "hope" that he would testify against defendant if convicted. Clearly, defendant was worn down by the delay. Even if the People's primary goal was

to improve their case against defendant at trial, their delays were unreasonable and should not be counted against defendant when their conduct ultimately gave them a tactical advantage.

Finally, even if it was not the People's intent to gain a tactical advantage over defendant, it was certainly foreseeable that a teenager incarcerated at Rikers Island for a number of years would be likely to plead guilty, given the well known inadequacies of Rikers for long term incarceration, particularly for adolescents (*see e.g.* U.S. Department of Justice, Findings of the U.S. Attorney's Office for the Southern District of New York into the Treatment of Adolescent Male Inmates at Rikers [Aug. 4, 2014], available at https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf [accessed Sept. 21, 2016], cached at http://www.nycourts.gov/reporter/webdocs/SDNY_Rikers_Report.pdf; William Neuman, *New York City Wants to Move 16- and 17-Year-Olds From Rikers Jail to Bronx Center*, NY Times, July 20, 2016, available at http://www.nytimes.com/2016/07/21/nyregion/rikers-jail-youths-bronx-center.html, [accessed Sept. 21, 2016], cached at http://www.nycourts.gov/reporter/webdocs/NewYorkCityWantstoMove16and17YearOldsFromRikersJailtoBronxC.pdf [discussing the New York City Mayor's Office of Criminal Justice's announcement of a plan to move teens out of Rikers and into a separate facility, after a settlement with the Department of Justice called on New York City to do so]).[4] From the defendant's perspective, it makes little difference whether the prosecution intended this result, or merely disregarded the likelihood of its occurrence. Indeed, the coercive effect of the long delays is further suggested by defendant's agreement to withdraw his second speedy trial motion at the time of his plea, even though withdrawal of a speedy trial motion is an impermissible, "inherently coercive" condition of a plea agreement (*People v Blakley*, 34 NY2d at 313). Therefore, it is my view that the People have not shown good cause for the extraordinary delay in this case.

I also find that the fourth *Taranovich* factor, whether there has been an extended period of pretrial incarceration, favors the defendant. The majority suggests that this factor is

---

4. This Court may take judicial notice of "[d]ata culled from public records" (*Matter of Siwek v Mahoney*, 39 NY2d 159, 163 n 2 [1976]), and "material derived from official government [w]eb sites" (*Matter of LaSonde v Seabrook*, 89 AD3d 132, 137 n 8 [1st Dept 2011], *lv denied* 18 NY3d 911 [2012]).

mitigated by defendant's indictment and incarceration on other charges. I disagree for four reasons. First, there is no legal support for the proposition that defendant's time under indictment, prior to conviction and sentencing, is to be considered on a speedy trial motion. Second, even discounting the period of time after defendant's sentencing on assault charges for an incident which occurred on October 5, 2011, defendant had already been incarcerated awaiting trial in this case for over three years at that point. Third, the incident that led to defendant's assault conviction occurred while he was incarcerated awaiting trial on the 2008 indictment. Accordingly, he might well not have been involved in that incident if not for the delay in his trial on the initial charges. The majority characterizes this as "sheer speculation and wishful thinking." This misses the point. Defendant committed the assault in Rikers while he was incarcerated awaiting trial in this matter. There is no indication in the record that defendant had any criminal history prior to his arrest in the instant matter. Accordingly, it is hardly speculative to reason that, had he not been in Rikers awaiting trial on the instant matter, he would have been unlikely to have been there at the time that the incident leading to the assault charge took place. Similarly, in saying that "regardless of the proceedings under the instant indictment, defendant would undoubtedly have been incarcerated due to his indictment for entirely separate and violent felonies," the People ignore the fact that defendant had no criminal record until this incident, so there is no reason to think he would have become involved in other criminal incidents if he had not already been incarcerated.[5] Fourth, the People's failure to bring defendant to trial is not excused by his being incarcerated within New York on a separate matter (*People v Singer*, 44 NY2d at 254 ["Certainly his incarceration within the State offers no excuse for delaying the prosecution on new charges"]; *People v Winfrey*, 20 NY2d at 141).[6]

---

**5.** The majority also has no basis for asserting that defendant was involved in an assault in 2009, since there was no basis in the record to support that, except an indictment which was dismissed.

**6.** The majority states that this Court has "consistently held that the time during which a defendant is incarcerated on other charges is not charged to the People." However, this is only true where defendant is being held in another jurisdiction and the People are unable to obtain defendant's transfer despite due diligence (*see People v Singer*, 44 NY2d at 254; *People v Winfrey*, 20 NY2d at 141-142). Indeed, *People v Jackson* (178 AD2d 305, 305-306 [1st Dept 1991], *lv denied* 79 NY2d 948 [1992]), cited by the majority, held that the 18 months "during which defendant was made available by Federal authorities but no efforts were made to secure defendant's return, should be

Finally, as to the fifth *Taranovich* factor, the majority points out that defendant makes no specific claim of prejudice to his defense. However, under the New York State Constitutional right to due process, "in a proper case, a lengthy and unjustifiable delay in commencing the prosecution may require dismissal even though no actual prejudice to the defendant is shown" (*People v Singer*, 44 NY2d at 253-254; *see also People v Staley*, 41 NY2d at 792); this is partly because "a defendant confined to jail prior to trial is obviously disadvantaged by delay" (*Barker v Wingo*, 407 US at 527). Indeed, a showing of actual prejudice to the defense is only required where the delay complained of is preindictment (*People v Singer*, 44 NY2d at 252; *People v Staley*, 41 NY2d at 792). Moreover, as the Supreme Court has explained, "[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim[,] . . . it is part of the mix of relevant facts, and its importance increases with the length of delay" (*Doggett v United States*, 505 US 647, 655-656 [1992]). Additionally, it is likely that the delay in bringing defendant's case to trial actually prejudiced his defense, since his incarceration would have made it "difficult for him to participate in his own defense, confer with counsel and contact witnesses" (*People v Romeo*, 12 NY3d 51, 58 [2009], *cert denied* 585 US 817 [2009]).Another reason no actual prejudice to the defense is required where the delay is long enough is that "[s]ociety, as well as the defendant, has an important interest in assuring prompt prosecution of those suspected of criminal activity" (*People v Staley*, 41 NY2d at 792). The majority downplays society's interest in prompt prosecutions because the Court of Appeals did not specifically enumerate it as a factor in *Taranovich*. However, the *Taranovich* factors are derived from those identified by the U.S. Supreme Court in *Barker v Wingo* (*People v Taranovich*, 37 NY2d at 445), which notes that the speedy trial doctrine is based on both the right of defendants to be treated fairly and the public interest in deterrence and rehabilitation (*Barker v Wingo*, 407 US at 519-520). The Court of Appeals recognized this important principle in a case decided a mere five months after *Taranovich* (*People v Johnson*,

---

charged to the People." The other cases cited by the majority for the same proposition give insufficient facts to draw a connection between the respective defendant's incarceration on other charges and the People's reason for delay, but all cite to *Jackson* (*People v Neal*, 208 AD2d 400, 400 [1st Dept 1994], *lv denied* 84 NY2d 1014 [1994]; *People v Allen*, 203 AD2d 97, 98 [1st Dept 1994], *lv denied* 83 NY2d 963 [1994]; *People v Davis*, 197 AD2d 375, 376 [1st Dept 1993], *lv denied* 82 NY2d 893 [1993]).

38 NY2d at 276; *see also People v Singer*, 44 NY2d at 254; *People v Staley*, 41 NY2d at 792). As relevant to this case, courts have consistently recognized that "seeking or obtaining convictions long after the offense was committed disrupts the rehabilitation process" (*People v Singer*, 44 NY2d at 254; *People v Johnson*, 38 NY2d at 276; *see also Barker v Wingo*, 407 US at 520 [lengthy exposure to conditions in local jail while awaiting trial is destructive and makes rehabilitation more difficult]). The public's interest in rehabilitation of criminal defendants is of particular concern where the defendant is young; as the Court of Appeals held in dismissing an indictment after 31 months, "It is more than of passing significance that defendant at the time of his arrest was 17 years old, perhaps still within the age group when the probability of rehabilitation is greater than at a later age" (*People v Staley*, 41 NY2d at 792).

Here, defendant was 16 at time of his arrest. There is no evidence that he had any criminal history prior to his incarceration in May 2008. He spent the majority of his adolescence, and more than a quarter of his life, behind bars awaiting trial. While in jail, he became involved in an incident that led to an assault charge and conviction. At Rikers, he would have had fewer opportunities to begin any meaningful process of rehabilitation. Even if the passage of time had not prejudiced defendant's ability to present a defense at trial (*but see e.g. Barker v Wingo*, 407 US at 533), I would argue that the long delay precluded him from engaging in meaningful rehabilitation, thus causing enormous prejudice, both to defendant and to the people of this state, who have an interest in rehabilitation of all offenders, especially those as young as defendant.